UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| EXPRESS SCRIPTS, INC, and MEDCO HEALTH SOUTIONS, INC. | )<br>)<br>) |
| Plaintiff, | )<br>) |
| vs. | ) Case No: 4:15CV1251 HEA<br>) |
| PHARMLAND, LLC d/b/a LIFECARE, et al., | )<br>)<br>) |
| Defendant. | )<br>) |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on defendants Carlos Mazariegos and Nundy's Motion to Dismiss, [Doc. No. 14]. The following facts are alleged in the complaint and, for the purposes of the motions to dismiss, are presumed true.

Express Scripts is a Pharmacy Benefit Manager ("PBM") offering a range of services to clients that include managed care organizations, health insurers, third-party administrators, employers, union-sponsored benefit plans, workers' compensation plans, and government health programs. Express Scripts helps clients improve healthcare outcomes for their members while helping plan sponsors address access and affordability concerns resulting from rising drug costs.

Prescription drugs are dispensed to members of the health plans Express

Scripts serves through networks of retail pharmacies under non-exclusive contracts with Express Scripts.

The integrity and reputation of Express Scripts' pharmacy provider network is critical, so Express Scripts maintains an ongoing network provider quality assurance, audit and investigation program.

LifeCare was a member of one or more Express Scripts pharmacy network pursuant to an Express Scripts, Inc. Pharmacy Provider Agreement, which by its terms incorporated the Network Provider Manual (collectively referred to as the "Agreement"). The Agreement between LifeCare and Express Scripts was, at all relevant times, a valid contract and supported by adequate consideration. When LifeCare agreed to participate in the Express Scripts pharmacy networks, it agreed to abide by the Agreement.

For years, LifeCare reported to Express Scripts and Medco that it operated a traditional retail pharmacy, with less than 5% of its business devoted to dispensing compounded medications. However, upon information and belief, this representation was untrue. After identifying multiple suspect claims submitted by LifeCare, Express Scripts initiated an investigation in or about December 2014 based on suspicion of fraudulent activity. On December 31, 2014, Express Scripts wrote to LifeCare requesting documentation to verify that certain prescriptions were actually prescribed and dispensed between May and November of 2014.

LifeCare was to provide the verification documentation no later than January 7, 2015. No documentation was ever provided. LifeCare then abruptly and without any basis or explanation reversed $1,311,618.78 in claims already paid by Express Scripts to LifeCare, leaving LifeCare's account with a $1,308,958.50 balance due to Express Scripts. Under normal conditions, amounts reversed by a provider like LifeCare would be offset against future payments. However, LifeCare ceased submitting new claims to Express Scripts, preventing Express Scripts from recouping the amount of the reversed claims. Despite multiple requests for payment, LifeCare never paid Express Scripts the amount owed.

On March 5, 2015, Express Scripts provided written notification, terminating LifeCare as an Express Scripts/Medco pharmacy provider for failure to cooperate in the audit and investigation. On March 7, 2015, Express Scripts provided LifeCare with written notification of $702,014.08 in uncontested discrepancies arising out of the investigation initiated in December 2014. LifeCare was to remit payment by March 23, 2015. LifeCare never paid Express Scripts for the discrepant claims. Under the Agreement, Express Scripts is entitled to recover funds from LifeCare associated with claims that were not submitted in accordance with the Agreement. For example, Section 3.1.a of the Provider Agreement states:

ESI may refuse to pay any claim or may reverse payment of any claim that is not submitted in accordance with the terms and conditions of this Agreement."

Section 3.2.a of the Provider Agreement states that "any payments made to [LifeCare] in excess of any amount properly determined to be due by ESI may be recovered by ESI from [LifeCare]…" Section 5.3 of the Provider Manual states that "[c]laims not submitted in accordance with [the Provider Agreement and the Provider Manual] are subject to reversal and recoupment of paid claims."

A total of $1,998,417.81 was reversed and/or subject to recoupment for failure by LifeCare to substantiate that the claims submitted to Express Scripts were valid. Despite repeated demand for payment, LifeCare has refused to reimburse Express Scripts, in breach of the Agreement.

In addition to recouping money paid to LifeCare, under Section 5.1 of the Provider Manual, Express Scripts may recover an additional 15% of the total value of claims for which Express Scripts' investigation revealed that LifeCare violated the terms of the Agreement. Fifteen percent of the amount identified above is $299,762.67, leaving a total of $2,298,180.48 due to Express Scripts pursuant to the terms of the Agreement.

Mazariegos and Nundy dominated and controlled LifeCare and operated it in such a way that it was merely an alter ego used for the personal benefit of Mazariegos and Nundy, and a cover for wrongdoing against Express Scripts. Using their corporate entity, Mazariegos and Nundy submitted prescription claims to Express Scripts that were later identified as containing discrepancies. After

being alerted to the fact that Express Scripts had initiated an investigation, Mazariegos and Nundy directed LifeCare to reverse claims, failed to substantiate claims, and refused to pay Express Scripts the amount owed. For example, under the direction of Mazariegos and Nundy, LifeCare represented to Express Scripts that it had purchased, and was entitled to reimbursement for, prescription ingredients LifeCare could never substantiate.

Similarly, under the direction of Mazariegos and Nundy, LifeCare submitted claims for reimbursement for which LifeCare was never able to provide copies of valid prescriptions. Moreover, under the direction of Mazariegos and Nundy, LifeCare reversed claims for which it had already been paid over a million dollars, and failed to reimburse Express Scripts for those claims.

Shortly after receiving Express Scripts' notice of termination and defaulting on over one million dollars owed to Express Scripts, Mazariegos and Nundy embarked on a lavish and extravagant spending spree. For example, upon information and belief, at or around the same time that LifeCare was failing to pay Express Scripts, Mazariegos used money from the assets of LifeCare to purchase a fleet of extravagant sports cars including a 2015 Lamborghini Huracan; Porsche 911 convertible; 2015 Ferrari 458 convertible; 2015 Nissan GT-R; Ferrari 360 convertible; Maserati Granturismo, and other property in Florida.

Notably, just days after receiving notice of termination and after reversing over $1.3 million claims already paid to LifeCare, Mazariegos purchased an $800,000 house, two new Ferraris, a Porsche, and a Lamborghini. While failing to pay his business debts to Express Scripts, Mazariegos spent over a million dollars on sports cars and a house. However framed, at least sometime in 2014, LifeCare became a front for wrongdoing perpetuated by Mazariegos and Nundy and a mechanism to attempt to defraud creditors, evade existing obligations, and escape liability for admitted debts.

Plaintiffs allege a claim for breach of contract, quantum meruit and unjust enrichment.

**Legal Standard**

The purpose of a Rule 12(b)(6) motion to dismiss for failure to state a claim is to test the legal sufficiency of a complaint so as to eliminate those actions "which are fatally flawed in their legal premises and deigned to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001) (citing *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989)). "To survive a motion to dismiss, a claim must be facially plausible, meaning that the 'factual content...allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Cole v. Homier Dist. Co., Inc.*, 599 F.3d 856, 861 (8th Cir. 2010) (quoting *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009)). The Court must "accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party." *Id.* (quoting *Coons v. Mineta*, 410 F.3d 1036, 1039 (8th Cir. 2005)). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster. *Iqbal*, 556 U.S. at 678.

In ruling on a motion to dismiss, the Court must view the allegations in the complaint liberally in the light most favorable to Plaintiff. *Eckert v. Titan Tire Corp.*, 514 F.3d 801, 806 (8th Cir. 2008) (citing *Luney v. SGS Auto Servs.*, 432 F.3d 866, 867 (8th Cir. 2005)). Additionally, the Court "must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party." *Coons v. Mineta,* 410 F.3d 1036, 1039 (8th Cir. 2005) (citation omitted). To survive a motion to dismiss, however, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007) (abrogating the "no set of facts" standard for Fed. R. Civ. P. 12(b)(6) found in *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957)). While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a

formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555.

## Discussion

"The alter ego theory is a separate and distinct cause of action under Missouri law." *Saidawi v. Giovanni's Little Place, Inc.,* 987 S.W.2d 501, 504 (Mo.Ct.App.1999). "'Under the alter ego rule, when a corporation is so dominated by a person as to be a mere instrument of that person and is indistinct from the person controlling it, then the court will disregard the corporate form if to retain it would result in injustice.'" *Id.* at 504–05(quoting *Edward D. Gevers Heating & Air Conditioning Co. v. R. Webbe Corp.,* 885 S.W.2d 771, 773 (Mo.Ct.App.1994)). "'To pierce the corporate veil, a plaintiff must meet a two-part test: first, the corporation must be controlled and influenced by persons or by another corporation; second, evidence must establish that the corporate cloak was used as a subterfuge to defeat public convenience, to justify a wrong, or to perpetrate a fraud.'" *Id.* at 505 (quoting *R. Webbe Corp.,* 987 S.W.2d at 773, 774).

To state a claim for piercing the corporate veil, a plaintiff must plead (1) control and complete domination of policy and business practice with respect to the transaction attacked; (2) defendant used the control to commit fraud or wrong, to perpetrate the violation of a positive legal duty, or to commit a dishonest and unjust act; and (3) that control and breach of duty was the proximate cause of the

injury or unjust loss. *Collet v. Am. Nat'l Stores, Inc.,* 708 S.W.2d 273, 283 (Mo.Ct.App.1986).

Plaintiffs have merely stated, in conclusory fashion, that the individual defendants dominated and controlled LifeCare. As Defendants correctly argue, control must be complete domination, such that the corporate entity has no separate existence of its own. *Radaszewski by Radaszewski v. Telecom Corp.*, 981 F.2d 305, 306 (8th Cir. 1992); *Stolzenburg v. Biewer Lumber, LLC,* 2016 WL 3582032 (E.D. MO 2016). The bold statement that the individuals were the alter ego of the corporation is insufficient under the *Twombly* standard.

## Conclusion

Plaintiffs' complaint fails to set forth sufficient facts to state a cause of action under an alter ego claim against the moving defendants. The Motion to Dismiss is well taken and will be granted.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss, [Doc. No. 18], is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs are granted 21 days from the

date of this Opinion to file an amended complaint.

Dated this 30th day of September, 2016.

_____
HENRY EDWARD AUTEY
UNITED STATES DISTRICT JUDGE