UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| EXPRESS SCRIPTS, INC. and<br>MEDCO HEALTH SOLUTIONS<br><br>  Plaintiff,<br><br>vs.<br><br>PHARMLAND, LLC D/B/A LIFECARE<br>PHARMACY, et al.,<br><br>  Defendants. | Case No. 4:15CV1251 HEA |

## **OPINION, MEMORANDUM AND ORDER**

This matter is before the Court on Defendants' Motion to Dismiss Count IV of Plaintiff's Second Amended Complaint, [Doc. No. 51]. Plaintiff opposes the Motion. For the reasons set forth below, the Motion is granted.

### **Facts and Background**

Plaintiff's Second Amended Complaint alleges:
Express Scripts is a Pharmacy Benefit Manager ("PBM") offering a range of services to clients that include managed care organizations, health insurers, third-party administrators, employers, union-sponsored benefit plans, workers' compensation plans, and government health programs. Express Scripts helps clients improve healthcare outcomes for their members while helping plan sponsors address access and affordability concerns resulting from rising drug costs.

Prescription drugs are dispensed to members of the health plans Express Scripts serves through networks of retail pharmacies under non-exclusive contracts with Express Scripts.

The integrity and reputation of Express Scripts' pharmacy provider network is critical, so Express Scripts maintains an ongoing network provider quality assurance, audit, and investigation program.

Lifecare was a member of one or more Express Scripts pharmacy networks pursuant to an Express Scripts, Inc. Pharmacy Provider Agreement ("Agreement"). The Agreement between Lifecare and Express Scripts was, at all relevant times, a valid contract and supported by adequate consideration. When Lifecare agreed to participate in the Express Scripts pharmacy networks, it agreed to abide by the Agreement.

For years, Lifecare reported to Express Scripts and Medco that it operated a traditional retail pharmacy, with less than 5% of its business devoted to dispensing compounded medications. However, upon information and belief, this representation was untrue. After identifying multiple suspect claims submitted by Lifecare, Express Scripts initiated an investigation in early December 2014 based on suspicion of fraudulent activity.

On or about December 31, 2014, Express Scripts notified Lifecare that its

investigation had uncovered "multiple discrepancies," and that Express Scripts intended to withhold payments to Lifecare until the investigation was complete.

On the same date, Express Scripts wrote to Lifecare requesting documentation to verify that certain prescriptions were actually prescribed and dispensed between May and November of 2014. Lifecare was to provide the verification documentation by no later than January 7, 2015. No documentation was ever provided. Instead, Lifecare abruptly and without any explanation reversed $1,311,618.78 in claims already paid by Express Scripts to Lifecare, leaving Lifecare's account with a $1,308,958.50 balance due to Express Scripts.

At the same time, Lifecare closed its retail operations, ceased all pharmacy operations, and sold its location to Walgreens.

Under normal conditions, amounts reversed by a provider like Lifecare would be offset against future payments. However, because Lifecare closed and ceased submitting new claims to Express Scripts, Express Scripts was prevented from recouping the amount of the reversed claims.

Despite multiple requests for payment, Lifecare never paid Express Scripts the amount owed. On March 5, 2015, Express Scripts provided written notification that it was terminating Lifecare as an Express Scripts pharmacy provider for failure to cooperate in the audit and investigation.

On March 7, 2015, Express Scripts provided Lifecare with written notification of an additional $702,014.08 in uncontested discrepancies arising out of the investigation initiated in December 2014. Lifecare was to remit payment by March 23, 2015. Lifecare never paid Express Scripts for the discrepant claims.

Under the Agreement, Express Scripts is entitled to recover funds from Lifecare associated with claims that were not submitted in accordance with the Agreement.

For example, **Section 3.1.a** of the Provider Agreement states:

ESI may refuse to pay any claim or may reverse payment of any claim that is not submitted in accordance with the terms and conditions of this Agreement.

**Section 3.2.a** of the Provider Agreement states that "any payments made to [Lifecare] in excess of any amount properly determined to be due by ESI may be recovered by ESI from [Lifecare]…"

**Section 5.3** of the Provider Manual states that "[c]laims not submitted in accordance with [the Provider Agreement and the Provider Manual] are subject to reversal and recoupment of paid claims."

A total of **$1,998,417.81** was reversed and/or subject to recoupment for failure by Lifecare to substantiate that the claims submitted to Express Scripts were valid.

Despite repeated demand for payment, Lifecare has refused to reimburse Express Scripts, in breach of the Agreement.

In addition to recouping money paid to Lifecare, under Section 5.1 of the Provider Manual, Express Scripts may recover an additional 15% of the total value of claims for which Express Scripts' investigation revealed that Lifecare violated the terms of the Agreement. Fifteen percent of the amount identified above is $299,762.67, leaving a total of **$2,298,180.48** due to Express Scripts pursuant to the terms of the Agreement.

Mazariegos and Nundy dominated and controlled Lifecare and operated it in such a way that it was merely an alter ego used for the personal benefit of Mazariegos and Nundy, and a cover for fraud against Express Scripts and others.

Mazariegos and Nundy made all corporate decisions for Lifecare, controlled all financial decisions for Lifecare, and exercised complete control over what claims to submit and what debts to repay from Lifecare's funds. As a result, the entity known as Lifecare was no more than the reflection of the decisions made and actions taken by Mazariegos and Nundy.

In 2014, Mazariegos and Nundy entered into a marketing agreement with Centurion Compounding Inc. ("Centurion"), which employed sales representatives to market compounded medications to beneficiaries of health care plans. These medications—generally creams for pain and scars—typically ranged in price from

$900 to $21,000 for a one-month supply. Centurion, Mazariegos, and Nundy entered into further agreements with physicians. Together, these parties participated in an illegal kickback scheme, in which Centurion recruited potential patients whose insurance would cover the high-cost medication and directed those patients to certain physicians. Those physicians completed preprinted prescription forms, often at after-hours, offsite clinics at hotels and retail stores. The physicians sent the prescriptions to Lifecare. Lifecare (as directed by Mazariegos and Nundy) filled the prescriptions and submitted claims for the prescriptions to the patients' health care plans.

For each claim paid, Mazariegos and Nundy paid illegal kickbacks to Centurion (50% of the proceeds) and the physician (10-15%) using Lifecare funds.

In addition to the illegal kickback scheme, Mazariegos and Nundy have admitted that they directed Lifecare to bill Medicare over $1 million for compounded medications that were made with ingredients that they knew Medicare did not cover.

A federal investigation was initiated on or around December 3, 2014 into the illegal kickback scheme. In or around March 2017, Mazariegos and Nundy pled guilty to using their control of Lifecare as part of a conspiracy to commit healthcare fraud against federal insurance benefit programs. Their fraudulent behavior further extended to directing Lifecare to perpetuate a fraud against Express Scripts.

Mazariegos and Nundy controlled Lifecare's claims submissions and determined which claims should be billed to Express Scripts. Mazariegos and Nundy controlled Lifecare's bank accounts that received the payment of claims from Express Scripts.

Using their control and complete domination over Lifecare's policy and business practices, Mazariegos and Nundy, through Lifecare, submitted millions of dollars in false and invalid prescription claims to Express Scripts. Mazariegos and Nundy later directed Lifecare to reverse these claims, thereby acknowledging that Lifecare was not entitled to payment.

As with their fraudulent Medicare submissions, Mazariegos and Nundy exercised complete control over Lifecare's representations to Express Scripts that it had purchased, and was entitled to reimbursement for, prescription ingredients that Lifecare could never substantiate.

Similarly, Mazariegos and Nundy exercised complete control over all of Lifecare's submissions of claims for reimbursement for which Lifecare was never able to provide copies of valid prescriptions.

Moreover, Mazariegos and Nundy exercised complete control over the decision to reverse claims for which Lifecare had already been paid over a million dollars, and complete control over the decision to not reimburse Express Scripts for those claims.

Mazariegos and Nundy used Lifecare's corporate entity status as a shield for defrauding Express Scripts so that they could employ the funds Lifecare owed to Express Scripts for Mazariegos' and Nundy's own personal use or to pay for their illegal kickback scheme.

Shortly after receiving Express Scripts' notice of termination and defaulting on over one million dollars owed to Express Scripts, Mazariegos and Nundy embarked on a lavish and extravagant spending spree using, upon information and belief, Lifecare's funds that were properly due and owing to Express Scripts.

At or around the same time that Mazariegos and Nundy were directing Lifecare reverse claims to fail to pay Express Scripts, and at or around the same time that Express Scripts and the federal government began investigating Lifecare, Mazariegos purchased a fleet of extravagant sports cars including a 2015 Lamborghini Huracan; Porsche 911 convertible; 2015 Ferrari 458 convertible; 2015 Nissan GT-R; Ferrari 360 convertible; Maserati Granturismo; and other property in Florida. Mazariegos has acknowledged that these purchases were made using Lifecare assets, as they are subject to forfeiture as proceeds traceable to the commission of a federal health care offense.

Just days after receiving Express Scripts' notice of termination and after reversing over $1.3 million claims already paid to Lifecare, Mazariegos purchased

an $800,000 house, two new Ferraris, a Porsche, and a Lamborghini, all with assets that he has now admitted were acquired using Lifecare proceeds.

While failing to pay his business debts to Express Scripts, Mazariegos spent over a million dollars on sports cars and a house. Therefore, Mazariegos stripped Lifecare's assets in order to avoid the demand of creditors like Express Scripts.

However framed, at least sometime in 2014, Lifecare became a front for fraud perpetuated by Mazariegos and Nundy and a mechanism to attempt to defraud creditors, evade existing obligations, and escape liability for admitted debts.

With respect to Count IV, Plaintiff alleges that Lifecare was dominated and controlled by Mazariegos and Nundy in such a way that it was merely the alter ego for Mazariegos and Nundy. They exercised complete control and domination over every decision made by Lifecare, including, but not limited to, decisions regarding what claims to submit, what claims to reverse, and what claims to repay (or, in this case, not repay) Express Scripts.

In stripping the assets of Lifecare for their own personal use, Mazariegos and Nundy used Lifecare as a cover to defraud creditors, evade existing obligations, and to hide invalid, false, and fraudulent prescription claims.

Through their alter ego Lifecare, Mazariegos and Nundy knowingly submitted millions of dollars in unsupported and undocumented prescription claims to Express Scripts and Medco in 2014.

In submitting these claims for reimbursement, Mazariegos and Nundy, through their alter ego Lifecare, represented that the prescriptions were valid, supported by legitimate pharmacy records, and used ingredients actually purchased by Lifecare. In particular, for each and every false and invalid prescription claim submitted to Express Scripts for payment, Mazariegos and Nundy, through Lifecare, continued to make affirmative representations that the claims were based on accurate ingredient costs; the claims were supported by valid prescriptions and purchase records; the U&C prices were accurate; the claims were not being submitted to circumvent plan design; and Lifecare would collect the applicable copayment for the claims.

The representations made by Mazariegos and Nundy, through their alter ego Lifecare, as described were false, and Defendants knew that they were false when Mazariegos and Nundy, through Lifecare, made the representations to Express Scripts.

Express Scripts, on the other hand, did not know they were false at the time Defendants made such representations.

Defendants knew that the representations were material to Express Scripts' decision to pay Lifecare over $1.9 million for false and/or invalid prescription claims that Defendants submitted to Express Scripts.

Express Scripts relied on Defendants' representations, to their detriment, and have been damaged by at least $1,998,417.81.

Defendants move to dismiss for lack of subject matter jurisdiction, for failure to plead fraud with specificity and for failure to state a claim for "worthless" services.

## **Discussion**

Defendants contend that Plaintiff has failed to allege fraud with sufficient particularity pursuant to Rule 9(b) of the Federal Rules. Complaints alleging fraud must comply with Rule 9(b) of the Federal Rules. Under Rule 9(b), "the circumstances constituting fraud ⋯ shall be stated with particularity." Rule 9(b)'s "particularity requirement demands a higher degree of notice than that required for other claims," and "is intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations." *United States ex rel. Costner v. URS Consultants, Inc.,* 317 F.3d 883, 888 (8th Cir.2003) (citing *Abels v. Farmers Commodities Corp.,* 259 F.3d 910, 920-21 (8th Cir.2001)). To satisfy the particularity requirement of Rule 9(b), the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result. *See, e.g., Schaller Tel. Co. v. Golden Sky Sys., Inc.,* 298 F.3d 736, 746 (8th Cir.2002). The complaint must identify the "who,

what, where, when, and how" of the alleged fraud. *Costner,* 317 F.3d at 888 (citing *Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 550 (8th Cir.1997)); *U.S. ex rel. Joshi v. St. Luke's Hosp., Inc.,* 441 F.3d 552, 556 (8th Cir. 2006). Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity." Rule 9(b) requires more than "conclusory and generalized allegations." *Joshi,* 441 F.3d 552, 557(citing *Schaller Tel. Co. v. Golden Sky Sys., Inc.,* 298 F.3d 736, 746 (8th Cir.2002) ("'[C]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy [Rule 9(b) ].'") (quoting *Commercial Prop. Inv. v. Quality Inns,* 61 F.3d 639, 644 (8th Cir.1995).

The Court agrees with Plaintiff that it has set forth the who, what, where, when and how of each of the allegedly false claims. In its description of the fraudulent claims, Plaintiff details who took the actions and what actions were taken in attempting to defraud Plaintiff, the timeframe within which these actions were taken, where and how Defendants allegedly defrauded Plaintiff. As the Eighth Circuit acknowledged in *Joshi,* "Nothing requires [the plaintiff] to state every factual detail concerning every alleged fraudulent claim submitted...." *Joshi,* 441 F.3d at 560. Thus, the detailed Second Amended Complaint sufficiently sets forth the alleged fraud with the requisite particularity as mandated by Rule 9(b).

## Conclusion

Based upon the foregoing, the Motion to Dismiss Count IV is denied.

Accordingly,

**IT IS HEREBY ORDERED** that the Motion to Dismiss, [Doc. No. 51] is denied.

Dated this 29th day of December, 2017.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE